**Mary ANGELINE, Plaintiff,**

v.

**MAHONING COUNTY AGRICULTURAL SOCIETY dba The CANFIELD FAIR, et al., Defendants.**

No. 4:96CV 01835.

United States District Court, N.D. Ohio, Eastern Division.

Feb. 5, 1998.

Jan R. Mostov, Kevin David Mager, Youngstown, OH, for Mary Angeline.

Michael W. Gleespen, Office of the Attorney General, Columbus, OH, Bernard J. Wilkes, III, Wilkes, Wilkes & Welsh, Youngstown, OH, William J. Kish, Canfield, OH, for Mahoning County Agricultural Society.

Cheryl D. Minsterman, Office of the Attorney General, Columbus, OH, for Fred L. Dailey.

## *MEMORANDUM OPINION AND ORDER*

ECONOMUS, District Judge.

### *Background*

Plaintiff filed her original Complaint on August 23, 1996, pursuant to 42 U.S.C.

§ 1983. On November 25, 1996, Plaintiff filed an Amended Complaint For Damages And For Declaratory And Injunctive Relief. In the Amended Complaint, Plaintiff sought money damages and other relief from defendant Society, and injunctive and declaratory relief with respect to defendant Dailey.

The Society did not file an Answer to the Amended Complaint. Dailey filed an Answer to the Amended Complaint on December 17, 1996.

On January 27, 1997, both defendants filed their respective motions for summary judgment. On March 11, 1997, Plaintiff filed a Memorandum in opposition to the Society's motion for summary judgment and a motion for judgment on the pleadings against the Society and, on the same date, a Memorandum in opposition to Dailey's motion for summary judgment and a motion for judgment on the pleadings against Dailey. On March 26, 1997, Dailey filed a Reply Memorandum to Plaintiff's Memorandum in opposition to Dailey's motion for summary judgment ("Reply Memorandum"). On the same date, the Defendants jointly filed a Memorandum in opposition to Plaintiff's motions for judgment on the pleadings ("Joint Memorandum"). Finally, on April 7, 1997, Plaintiff filed a Reply Memorandum to Dailey's Reply Memorandum and Defendants' Joint Memorandum.

Plaintiff, Mary Angeline, is a resident of Mahoning County, Ohio. Defendant Society is located in Mahoning County and is a political subdivision of the State of Ohio. Defendant Dailey, in his official capacity as Director of the Ohio Department of Agriculture, directs the activities of said Department of the State of Ohio.

This suit is authorized pursuant to 42 U.S.C. § 1983, and this Court has pendent jurisdiction over Count Four of the Amended Complaint because the claim set forth therein arises from the same transactions, operative facts and circumstances as the Federal claims presented herein.

### Facts

In May of 1995, Plaintiff sought the opinion of defendant Dailey as to whether Plaintiff's proposed plan to operate a concession at the Canfield Fair (in which—in addition to general free information about the subject of astrology—she would offer for sale "electronically-prepackaged, computer generated astrological planet and star summaries") would be prohibited under either Ohio statutes or Department of Agriculture rules and regulations.

By way of a letter dated May 19, 1995, an employee of Dailey informed Plaintiff that her proposed service or form of entertainment would not ostensibly constitute a prohibited activity at a county fair. Plaintiff subsequently entered into an agreement with the Canfield Fair pursuant to which she would operate an outside concession-trailer at the 1995 Canfield Fair.

On August 31, 1995, shortly after Plaintiff had begun operation of her concession at the Fair, and following a brief inspection of her concession-trailer by an employee of Dailey, said employee caused Plaintiff to cease operation of her concession, for the alleged reason that her concession constituted a prohibited activity pursuant to Ohio Administrative Code 901:9–2–05 (the "Rule"). While several employees or agents of the Society were also present with Dailey's employee at this inspection, these individuals did not participate in the "cease operation" decision.

### Law

### I. DEFENDANT DAILEY IS NOT ENTITLED TO A QUALIFIED IMMUNITY.

#### 1. No Doctrine Of Qualified Immunity Is Applicable To Dailey.

▮▮▮▮ Plaintiff seeks only injunctive and prospective relief against Dailey. Suits against states in federal court for **retrospective** relief are generally barred by the Eleventh Amendment. Under the famous legal fiction established in *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), however, a suit against a state official for **prospective** relief, seeking to compel the state official to comply with federal law, is not treated as a suit against the state for Eleventh Amendment purposes.

In *Will v. Michigan Department of State Police,* the Supreme Court applied this "bifurcated theory" of the Eleventh Amendment

to the definition of "person" under § 1983, holding that "a State official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official capacity actions for prospective relief are not treated as actions against the State.'" 491 U.S. 58, 71 n. 10, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

■ Accordingly, because Dailey is sued only in his official capacity, as Director of the Ohio Department of Agriculture, and because Plaintiff seeks only prospective injunctive and declaratory relief and an award of attorney's fees against him, said defendant is not entitled to assert herein the defense of qualified immunity, as a matter of law. *Will*, supra. Also see *Harlow v. Fitzgerald* (1982), 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396.

### 2. Attorney's Fee Award.

■ Dailey is not immune to an award of attorney's fees in this case:

"Congress has made clear in § 1988 its intent that attorney's fees be available in *any* action to enforce a provision of § 1983. [Citation omitted.] The legislative history of the statute confirms Congress' intent that an attorney's fee award be available when damages would be barred or limited by 'immunity doctrines and special defenses, available only to public officials.' [Citations omitted.] ('The House Committee Report on [§ 1988] indicates that Congress intended to permit attorney's fees awards in cases in which prospective relief was properly awarded against defendants who would be immune from damages awards.')"

*Pulliam v. Allen* (1984), 466 U.S. 522, 543–544, 104 S.Ct. 1970, 80 L.Ed.2d 565.

## II. *THE APPLICABLE STANDARD OF REVIEW.*

This case is about commercial speech **plus** "pure first amendment speech." *44 Liquormart Inc. v. Rhode Island* (1996), 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711 does not contemplate *all* of the free speech issues which exist in the instant case.

■ Whenever a state burdens the freedom of speech, the law must be analyzed under the strict scrutiny required by the First Amendment, as well as by the guarantees of the due process and equal protection provisions of the federal constitution. See Rotunda and Nowak, *Treatise On Constitutional Law: Substance & Procedure* (3d ed. 1992) at 491. Freedom of speech is a fundamental right. *Id.*

■ The solicitation of money and the distribution of literature are two different categories of *speech,* each of which enjoys protection under the First Amendment. *Ater v. Armstrong,* 961 F.2d 1224, 1228 (6th Cir.1992). These types of speech are permissibly regulated in some, but not all, circumstances. In a case involving a First Amendment challenge to a content-based statute or regulation such as the instant case—strict scrutiny is the applicable standard. *Burson v. Freeman* (1992), 504 U.S. 191, 112 S.Ct. 1846, 119 L.Ed.2d 5.

■ The First Amendment generally prevents government from proscribing speech, or even expressive *conduct,* because of disapproval of the ideas expressed. Content-based regulations are "presumptively invalid." *R.A.V. v. St. Paul* (1992), 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 at 317. In the case at bar, the Rule is substantially overbroad, because it reaches "expressive conduct" which is not unlawful and therefore protected by the First Amendment. *Id.,* 120 L.Ed.2d at 327. Accordingly, the Rule is "fatally overbroad and invalid on its face." *Id.* at 338–339.

■ Government regulation of expressive activity is content neutral so long as it is "justified without reference to the content of the regulated speech." *Ward v. Rock Against Racism* (1989), 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661, 675. In the case at bar, the Rule is not "content neutral" and is not "justified without reference to the content of the regulated speech," because it attempts to ban a "particular manner or type of expression at a given time or place" solely on the basis of the content of the expression. *Ward, supra,* 105 L.Ed.2d at 675, 682–683. "A complete ban can be narrowly tailored but only if *each activity* within the proscription's scope is an *appropriately* targeted evil."

*Ward* at 681, quoting *Frisby v. Schultz* (1988), 487 U.S. 474 at 485, 108 S.Ct. 2495, 101 L.Ed.2d 420.

Since the Rule herein is not "content neutral" under the *Ward* analysis, the Rule is most properly analyzed as a "content-based" time, place, or manner restriction. See, e.g. *Widmar v. Vincent* (1981), 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440.

Whether the activities expressly prohibited on the face of the Rule are considered **conduct** or **speech**, there can be no genuine disagreement that this prohibition is "content-based." This is immediately obvious after even a single reading of the Rule.

██ **In the First Amendment context,** criminal statutes must be scrutinized with particular care; those that make unlawful a substantial amount of *constitutionally protected conduct* may be facially invalid *even if they also have legitimate application.* See *Houston v. Hill* (1987), 482 U.S. 451, 459, 107 S.Ct. 2502, 96 L.Ed.2d 398. The Rule herein is certainly analogous to a "criminal statute" since by its terms it specifically "prohibits" certain "activities." Some or all of these "activities" are no doubt "constitutionally protected" by the federal constitution.

██ Although the Rule conceivably may have a "legitimate application," the burden is on the proponent of the Rule to show such application. See *44 Liquormart, supra,* 134 L.Ed.2d at 728–729. Moreover, "[t]he principal inquiry in determining content neutrality, in speech cases and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward, supra,* 105 L.Ed.2d at 675.

██ The federal constitution forbids a State from enforcing certain exclusions from a **public forum** generally open to the public, even if it was not required to create the forum in the first place. See *Widmar, supra,* 70 L.Ed.2d at 446. The proponent of the regulation must show that its regulation is necessary to serve a **compelling** state interest and that it is narrowly drawn to achieve that end. *Id.* at 448.

In *44 Liquormart,* the Supreme Court had occasion to extensively review its earlier decisions with respect to "content-based" regulations. In the instant case, as in *44 Liquormart,* "the commercial speech ban *targets information* about entirely lawful behavior." *Id.,* 134 L.Ed.2d at 731 (emphasis added).

In *44 Liquormart,* the Supreme Court rejected the State's "so-called 'vice' exception to our commercial speech doctrine," holding that State legislation relating to "vice activity" is not favored when it is directed at lawful products. *Id.* at 734. The Court noted the danger of allowing state legislatures to "justify censorship by the simple expedient of placing the 'vice' label on selected lawful activities...." *Id.* A 'vice' label that is unaccompanied by a corresponding prohibition against the commercial behavior at issue fails to provide "a principled justification for the regulation of commercial speech about that activity." *Id.* at 734–735.

Finally, the Court notes the case styled *Mitchell Stergo, et al. v. City of Highland Heights, et al,* Case No. C80–1910, N.D.Ohio, Eastern Division, William K. Thomas (Senior District Judge). The Court finds *Stergo* to be consistent in it reasoning with the other authorities cited herein and persuasive authority herein.

In *Stergo,* Judge Thomas declared certain sections of a city ordinance unconstitutional and unenforceable as violative of the federal constitution: "... I am convinced that 29–1980's [the ordinance] total ban on fortune-telling in Highland Heights violates the protection of the First Amendment and its guaranty of freedom of expression." *Stergo,* p. 10.

Judge Thomas carefully considered the case of *Davis v. State of Ohio,* 118 Ohio St. 25, 160 N.E. 473 (1928), upon which defendant Dailey relies for his proposition that "[f]ortunetelling is a well-documented threat to the health, safety, and welfare of the citizens of the State of Ohio." (Dailey's Motion For Summary Judgment, p. 10.) Judge Thomas observed:

"... the Supreme Court of Ohio summed up several cases which it had examined, and the court stated, 'Those cases are valuable as indicating that fortune-telling and

similar crafts are fraudulent practices and, therefore not within the protection afforded to a lawful business.'

"Other than this reference, there is no other statement in the opinion that makes any reference to the alleged fraudulent nature of the craft of fortune telling, to use the term of the Ohio Supreme Court. Therefore, the opinion itself is devoid of any factual record or factual statement to support its conclusion that indeed, the state statute bore a reasonable relation to the public welfare and public morals.

"One, therefore, must conclude that *Davis v. State* does not stand today as a controlling authority that fortune telling is inherently a fraudulent occupation ...

"Hence, I arrive at the conclusion and I do find that the evidentiary record does not show that a complete ban of fortune telling in Highland Heights bears 'any reasonable relation to the public welfare and public morals' of the residents of the city ...

"It is concluded that the communication at issue here between the fortune teller and her customer does not concern 'purely commercial transactions,' nor is it related 'solely to the economic interest of both speaker and audience' ...

"For these reasons, the Court determines that the provision of readings alone does not 'propose a commercial transaction.' Therefore, the Court finds that the communication at issue here is not commercial speech."

*Stergo,* at pp. 3–6, 9–10, 14–15.

In the case at bar, based upon the above-quoted rationale of Judge Thomas, this Court similarly concludes that *"Davis v. State* does not stand today as a controlling authority that fortune telling is inherently a fraudulent occupation." *Stergo,* p. 4. The "unspoken premise" of the Rule in the case at bar, that fortune telling, phrenology, horoscope and the other practices prohibited by the Rule are "inherently fraudulent," is not supported by any "factual record" or "factual statement," just as the "unspoken premise" of the ordinance considered in *Stergo* was not so supported. (See *Stergo,* pp. 4, 6.)

## III. *FORUM ANALYSIS*

 In this case, the Canfield Fairgrounds is a "limited public forum," as was the Minnesota State Fair in *Heffron v. Int'l Society For Krishna Consc.* (1981), 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298, 311. In balancing the interest of the government in limiting the use of its property against the interests of those who wish to use the property for expressive activity, the Supreme Court has identified three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum. See *Airport Commrs. v. Jews For Jesus, Inc.* (1987), 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed.2d 500, 506. A designated public forum—whether of a limited or unlimited character—is property that "the State has opened for expressive activity by part or all of the public. Regulation of such property is subject to the same limitations as that governing a traditional public forum." See *International Society for Krishna Consciousness v. Lee* (1992), 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541, 550. The proper First Amendment analysis differs depending upon whether the area in question falls in one category rather than another. *Id.* In a traditional public forum or a public forum by government designation, the Supreme Court has held that First Amendment protections are subject to "heightened scrutiny":

"In these quintessential public forums, the government may not prohibit all communicative activity. For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end ... The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."

*Jews For Jesus, Inc., supra,* 96 L.Ed.2d at 506, quoting *Perry Ed. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794.

 Even assuming *arguendo* the Canfield Fairgrounds to be a nonpublic forum, access to a **nonpublic** forum may be restrict-

ed by government regulation only as long as the regulation "is reasonable and not an effort to suppress expression merely because officials oppose the speaker's view." *Id.,* 96 L.Ed.2d at 506.

## IV. *THE NATURE OF PLAINTIFF'S INTENDED SPEECH AND EXPRESSION.*

The nature of the expressive activity in which Plaintiff attempted to engage at the Fair, as well as the nature of the forum within which this activity would occur, in large measure determines the appropriate standard of review for the Rule to be applied to determine the dispositive motions pending before the Court.

In *Heffron, supra,* the Supreme Court held that a State fair rule requiring religious organizations to sell literature and solicit donations at an assigned location within the fairgrounds was not inconsistent with the First and Fourteenth Amendments. The Court carefully articulated its rationale:

"The State does not dispute that the oral and written dissemination of the Krishnas' religious views and doctrines is protected by the First Amendment.... Nor does it claim that this protection is lost because the written materials sought to be distributed are sold rather than given away or because contributions or gifts are solicited in the course of propagating the faith. Our cases indicate as much ...

"As the Minnesota Supreme Court recognized, the activities of ISKCON, like those of others protected by the First Amendment, are subject to reasonable time, place and manner restrictions ...

"The issue here, as it was below, is whether Rule 6.05 is a permissible restriction on the place and manner of communicating the views of the Krishna religion; more specifically, whether the Society may require the members of ISKCON who desire to practice Sankirtan at the State Fair *to confine their distribution, sales, and solicitation activities to a fixed location.*

"A major criterion for a valid time, place and manner restriction is that *the restriction 'may not be based upon either the content or subject matter of speech.'* [Cita-

tion omitted.] Rule 6.5 qualifies in this respect, since ... the Rule applies evenhandedly to all who wish to distribute and sell written material or to solicit funds. No person or organization, whether commercial or charitable, is permitted to engage in such activities *except from a booth rented for those purposes.*

"Nor does Rule 6.05 suffer from the more covert forms of discrimination that may result when arbitrary discretion is vested in some governmental authority ... The Rule is not open to the kind of arbitrary application that this Court has condemned as inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view. [Citations omitted.] ...

"*Here, the Rule does not exclude ISKCON from the fairgrounds, nor does it deny that organization the right to conduct any desired activity at some point within the forum.* Its members may mingle with the crowd and orally propagate their views. *The organization may also arrange for a booth and distribute and sell literature and solicit funds from that location on the fairgrounds itself.* The Minnesota State Fair is a limited public forum in that it exists to provide a means for a great number of exhibitors temporarily to present their products or views, be they commercial, religious, or political, to a large number of people in an efficient fashion ... [W]e are unwilling to say that Rule 6.05 does not provide ISKCON and other organizations with an adequate means to sell and solicit on the fairgrounds. The First Amendment protects the right of every citizen to 'reach the minds of willing listeners and to do so *there must be opportunity to win their attention.*' [Citation omitted.] Rule 6.05 does not *unnecessarily limit* that right *within the fairgrounds.*" 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298, 306–307, 311. (Emphasis added throughout.)

It need hardly be said that two crucial differences between Rule 6.05 in *Heffron, supra,* and the Rule in the case at bar made the former a constitutionally-permissible reg-

ulation under the First and Fourteenth Amendments; while the latter fails to pass constitutional muster: 1) the restriction in *Heffron* was a valid time, place and manner restriction in that it was "not based upon either the content or subject matter of speech," i.e., Rule 6.05 "applied evenhandedly to all who wish to distribute and sell written material or to solicit funds" (*Id.*, 69 L.Ed.2d at 307); and 2) Rule 6.05, unlike the Rule in the case at bar, did not operate to *completely ban* any person or group *from the fairgrounds*, but merely required the Krishnas (along with any other interested person) "to confine their distribution, sales, and solicitation activities to a fixed location," i.e., a booth. (*Id.*)

The Court concludes that H*effron, supra,* commands that Plaintiff was legally entitled to operate her concession from a "fixed location" at the Canfield Fair, i.e., her concession trailer. Accordingly, the conduct of Dailey's employee of causing Plaintiff to cease operation of her concession, for the alleged reason that her concession constituted a prohibited activity pursuant to the Rule, was contrary to law.

### V. CONCLUSION

The proponent of the challenged regulation in this case—defendant Dailey—was required to show that the Rule is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. Dailey has failed to meet these requirements. As aforesaid, the Supreme Court in *44 Liquormart* and this Court in *Stergo, supra,* noted the danger of allowing state legislatures to "justify censorship by the simple expedient of placing the 'vice' label on selected lawful activities." *44 Liquormart, 134 L.Ed.2d* at 734.

In the case at bar, Dailey has cited no testimony, factual findings, or other indicia of an appropriate "legislative judgment" concerning the constitutional propriety of the complete ban worked by the Rule. Accordingly, the Rule must fall under *44 Liquormart,* and the Court therefore hereby denies Dailey's motion for summary judgment and grants Plaintiff's motion for judgment on the pleadings against Dailey.

The Rule in this case, like the ordinance challenged in *Stergo,* is unconstitutional and unenforceable on its face, because the total ban of the "prohibited activities" set forth in the Rule violates the protection of the First Amendment and its guarantee of freedom of expression accorded to lawful activities.

With respect to defendant Society, and consistent with the Court's aforesaid finding that Plaintiff was ordered to cease and desist the operation of her concession for the alleged reason that she had violated the Rule promulgated by Dailey, and not at the instance of anyone acting on behalf of defendant Society, the Court hereby grants the Society's motion for summary judgment and denies Plaintiff's motion for judgment on the pleadings against the Society.

The Court further finds and declares that Ohio Administrative Code 901:9-2-05 (the "Rule") is unconstitutional both on its face and as applied to Plaintiff. Accordingly, the Court **ORDERS** that Dailey is hereby enjoined from future enforcement of the Rule against any party, including Plaintiff, at any and all fairs within the State of Ohio, until further **ORDER** of this Court.

**IT IS SO ORDERED.**