Jason POWELL, Plaintiff,

v.

Larry NOBLE, in his official capacity as Commissioner of Iowa Department of Public Safety; Gary Slater, in his official capacity as Fair Secretary/Manager/CEO of Iowa State Fair; D. Smith, individually and in his official capacity as Officer for Iowa State Fair Patrol; and Michael Cunningham, individually and in his official capacity as Trooper for the Iowa State Patrol, Defendants.

No. 4:14–cv–236.

United States District Court, S.D. Iowa, Central Division.

Signed Aug. 5, 2014.

---

Robert Richard Anderson, Law Office of Robert R. Anderson, Huxley, IA, Nathan W. Kellum, Memphis, TN, for Plaintiff.

David L. Dorff, Grant K. Dugdale, Jeffrey C. Peterzalek, Iowa Attorney, General's Office, Des Moines, IA, for Defendants.

ORDER

ROBERT W. PRATT, District Judge.

On June 17, 2014, Jason Powell ("Plaintiff") filed a Complaint against Larry Noble ("Noble"), Gary Slater ("Slater"), D. Smith ("Smith") and Michael Cunningham ("Cunningham") (collectively "Defendants").[1] Clerk's No. 1. Plaintiff asserts generally that on August 15 and 16, 2013, he went to the Iowa State Fairgrounds ("Fairgrounds") to share his Christian message with Iowa State Fair ("Fair") attendees. Id. ¶¶ 38, 54. On both dates, Plaintiff was ejected from the Fairgrounds by either Iowa State Troopers ("Troopers") or Iowa State Fair Patrol ("Fair Patrol") officers under threat of arrest for criminal trespass. Id. ¶¶ 46–65. After his second ejection, Plaintiff was issued a formal ejection notice barring him from the Fairgrounds for the duration of the 2013 Fair. Id. ¶¶ 65–66. Plaintiff contends that Defendants' actions, taken under color of state law and authority, have deprived him of his fundamental rights to free speech and due process under the First and Fourteenth Amendments. Id. ¶¶ 3–4. He seeks "injunctive relief, declaratory relief, and nominal damages" pursuant to 42 U.S.C. §§ 1983 and 1988. Id. ¶ 2. More specifically, Plaintiff prays that the Court:

A. Assume jurisdiction over this action;

B. Enter a judgment and decree declaring the policy and practice of treating public property on Iowa State Fairgrounds outside of Iowa State Fair like private property and disfavored speakers in those areas like trespassers is unconstitutional on its face and as applied to Powell's desired speech because it vio-

---

1. Noble is sued in his official capacity as Commissioner of the Iowa Department of Public Safety. Slater is sued in his official capacity as Fair Secretary/Manager/CEO of the Iowa State Fair. Smith is sued individually and in his official capacity as an Officer for the Iowa State Fair Patrol. Cunningham is sued individually and in his official capacity as a Trooper for the Iowa State Patrol.

lates Powell's rights and the rights of third parties not before the Court, as guaranteed under the First and Fourteenth Amendments to the United States Constitution;

C. Enter a judgment and decree declaring that the ban on religious expression on public sidewalks and ways on the perimeter of Iowa State Fairgrounds outside of the Iowa State Fair is unconstitutional on its face and as applied to Powell's desired speech because it violates Powell's rights and the rights of third parties not before the Court, as guaranteed under the First and Fourteenth Amendments to the United States Constitution.

D. Enter a preliminary and permanent injunction enjoining defendants, their agents, officials, servants, employees, and all persons in active concert and participation with them, or any of them, from applying and enforcing policy and practice of treating public property on Iowa State Fairgrounds outside of Iowa State Fair and disfavored speakers in those areas like trespassers, so as to restrict constitutionally-protected speech of persons, including Powell and other speakers, in traditional public fora;

E. Enter a preliminary and permanent injunction enjoining defendants, their agents, officials, servants, employees, and all persons in active concert or participation with them, or any of them, from applying ban on religious expression on public sidewalks and ways on the perimeter of the Iowa State Fairgrounds outside of the Iowa State Fair, so as to restrict constitutionally-protected speech of persons, including Powell

and other speakers, in traditional public fora.

F. Adjudge, decree, and declare the rights and other legal relations with the subject matter here in controversy, in order that such declaration shall have the force and effect of final judgment;

G. That this Court award Plaintiff Powell nominal damages arising from the acts of the Defendants as an important vindication of his constitutional rights;

H. That this Court award Plaintiff Powell his costs and expenses of this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988 and other applicable law; and

I. Grant such other and further relief as appears to this Court to be equitable and just.

*Id.* at 14–16. On June 19, 2014, Plaintiff filed a Motion for Preliminary Injunction (Clerk's No. 3) requesting that the Court enjoin Defendants from "prevent[ing] Powell and other disfavored third party speakers from engaging in protected expression on public sidewalks outside of the Iowa State Fair during the 2014 event and all other future Iowa State Fairs." *Id.* at 1.

On July 14, 2014, Defendants filed an Answer to Plaintiff's Complaint and a resistance to his Motion for Preliminary Injunction. Clerk's Nos. 11, 12. Defendants generally deny Plaintiff's assertions of constitutional violations and argue that the Motion for Preliminary Injunction should be denied because Plaintiff has failed to meet his burden to demonstrate an entitlement to preliminary injunctive relief. Plaintiff filed a Reply in support of his Motion for Preliminary Injunction on July 22, 2014. Clerk's No. 15. The Court held a hearing on the matter on July 24, 2014.

Clerk's No. 16. Plaintiff's Motion for Preliminary Injunction is now fully submitted.

## I. FACTUAL BACKGROUND

### A. *Powell's Testimony & Factual Allegations*

Plaintiff contends that his Christian beliefs compel him to share his faith with others. Pl.'s First Aff. (Clerk's No. 3–1, Ex. A to Mot. for Prelim. Inj.) ¶ 2. Plaintiff shares his faith by standing on public sidewalks near his home, wearing clothing with Christian messages, holding signs or banners, engaging in open-air speech, and by holding one-on-one conversations with persons willing to speak with him. *Id.* ¶¶ 3–4. Plaintiff claims that he does not harass anyone, interfere with pedestrian traffic, create traffic congestion, use an amplification device, engage in activities that draw a crowd, ask for money, request that people join an organization, harass people, or otherwise cause a disturbance; rather, he focuses solely on spreading the message that "we have all sinned, we all need a savior, and Jesus Christ is that savior." *Id.* ¶¶ 5–9, 18–19. Plaintiff finds the Fairgrounds—particularly when the Fair is ongoing—to be an "ideal spot" to share his faith with others. *Id.* ¶ 10.

On Thursday, August 15, 2013, Plaintiff went to the Fairgrounds and situated himself on a sidewalk near the intersection of East 30th Street and Grand Avenue in Des Moines. *Id.* ¶ 14. Plaintiff contends that he was standing approximately 50 feet west of the ticket booth, and well outside the Fair's main entrance at Gate 11.[2] From this position, Plaintiff was able to share his Christian message with "anyone using the west gate [Gate 11] to enter or exit the Fair." *Id.* ¶ 15. At approximately 8:00 p.m., Plaintiff was approached by several Fair Patrol officers dressed in blue uniforms, with badges, handcuffs, and batons. *Id.* ¶¶ 20–21. One of the officers, Smith, ordered Plaintiff to stop his speech. *Id.* ¶ 20. According to Plaintiff, the officers surrounded him, stood very close to him, and ordered him to leave the sidewalk immediately. *Id.* ¶ 22. When Plaintiff asked the officers to confirm he was standing on public property, he was told by Smith simply that he needed to leave the property immediately. *Id.* ¶¶ 23–24. Plaintiff attempted again to clarify why he was being asked to leave, but was told by Smith that he would be arrested for trespassing if he did not leave immediately. *Id.* ¶ 26. Smith further told Plaintiff that he would need to go across the street if he wished to continue with his speech. *Id.* Plaintiff, fearing arrest, went across the street but, finding that location unsuitable to convey his message, ultimately left the area completely. *Id.* ¶¶ 27–28.

The following day, August 16, 2013, Plaintiff again attempted to share his Christian message with Fair-goers. *Id.* ¶ 29. This time, he positioned himself near Gate 15—close to the intersection of East 33rd Street and University Avenue— on a sidewalk in front of bathroom facilities. *Id.* Plaintiff contends that he was careful to locate himself in a spot that did not interfere with anyone's access to the Fair or the restrooms. *Id.* ¶ 31. He did not make an oral presentation on this day; rather he "just held a sign containing a Gospel message." *Id.* ¶ 32. At approximately 7:20 p.m., however, Plaintiff was approached by Fair Patrol officers who

---

2. During the approximately 11 days of the Fair each year, access to large swaths of the Fairgrounds is restricted. Persons wishing to access the Fair's events and activities must present a paid ticket at one of the Fair "Gates." There is no dispute that Powell never purchased a ticket and never attempted to engage in free speech activities inside the Fair itself, i.e., at any point within the Fair's admission Gates.

informed him he would need to leave the area. *Id.* ¶ 34. Plaintiff contends that when he asked why he had to leave, "[t]he officers told me that the Fair owned the property where I was standing and they didn't want me there." *Id.* ¶ 35. Plaintiff inquired further as to whether he was on public or private property. *Id.* ¶ 36. In response, one of the officers asked Plaintiff if he "was the one who caused the same problem on the day before." *Id.* ¶ 37. When Plaintiff responded affirmatively, the officer radioed Trooper Cunningham, who, upon arrival on the scene with another Trooper, escorted Plaintiff to a booking area and told Plaintiff he was committing trespass. *Id.* ¶¶ 38–40. Trooper Cunningham took Plaintiff's picture, obtained personal information, and warned him to stay away from the Fairgrounds, stating that Plaintiff would be "charged with criminal trespass if [he] ever returned to any part of the Fairgrounds, even if outside of the Fair, whether [he] was engaged in religious speech or not." *Id.* ¶¶ 41–43. Trooper Cunningham also gave Plaintiff an ejection notice, which stated:

> On 8–16–13 the following subject Jason Jon Powell was ejected from the Iowa State Fair as a result of case # 2013045714. The defendant has been informed that this ejection is for the duration of the 2013 Iowa State Fair, (which ends August 18, 2013). Should he/she return to the Iowa State Fairgrounds during this time period they will be charged with criminal trespassing in violation of Iowa Code Section 716.8 simple misdemeanor.

*Id.* ¶ 42; Ejection Notice (Clerk's No. 3–8, Ex. H. to Mot. for Prelim. Inj.). Fearing arrest, Plaintiff left the Fairgrounds and did not return for the duration of the 2013 Fair. First Aff. ¶ 44.

Plaintiff contends that neither the Fair Patrol nor the Troopers ever suggested in any way that Plaintiff's ejection from the Fair was due to: 1) a rule against poles or sticks on signs, or 2) Plaintiff causing some sort of pedestrian or traffic congestion. Pl.'s Second Aff. (Clerk's No. 15–1, Ex. J to Reply) ¶ 4 ("Neither rule was ever mention to me in 2013 when I was stopped from speaking [on either August 15 or 16, 2013]."); ¶ 11 ("[N]either on August 15 nor on August 16, did any of the numerous officers I encountered ever mention any concern about my sign. I was not given an option of sharing my message without a sign or without pole on my sign."); Hr'g Tr. at 58 [3] (Q. "Were you given a reason as to why you would have to leave [on August 15]?" A. "No." Q. "Were you given an option to be somewhere else on the fair ground property? A. "No. They said I had to go across the street now." Q. "Mr. Powell, were you ever told that you were impeding traffic?" A. "No. Never."); *id.* at 60–61 (Q. "When [Fair Patrol Officer] Orr approached you [on August 16], did he tell you what his concern was?" A. "No. He told me I had to leave." Q. "Leave what?" A. "Leave the property now.... He just said I had to go. He never gave me a direction or anywhere but he said I had to leave the property now." Q. "Were you told that you were impeding traffic?" A. No. Not at all."). Indeed, he contends that due to the way he situated himself, the wideness of the sidewalks, and "sizeable amount of space in the area around me, I was in no position to block anyone's path" on August 15. Pl.'s Second Aff. ¶ 7. Likewise, given where he was standing on August 16, Plaintiff contends it "was incon-

---

**3.** All references to the Hearing Transcript are to the unedited RealTime version provided to the Court by the Court Reporter.

ceivable that I—just standing there with a sign—could possibly block any pedestrian traffic." *Id.* ¶ 8. Rather, Plaintiff maintains that the "sole reason given for my forced departure was that I was conducting a speech activity on 'fair property' and fair officials wanted me to leave. No one ever suggested that I could stay inside the fair confines or on any other portion of the fairgrounds and continue my religious expression."[4] *Id.* ¶ 9. Plaintiff is concerned that should he attempt again to share his Christian message on Fair property during the upcoming 2014 Fair, he will again be ejected from the Fairgrounds and possibly arrested. *Id.* ¶ 19; Pl.'s First Aff. ¶ 50 ("As things currently stand, I am stymied from going back to the Fairgrounds during the 2014 Iowa State Fair and sharing my Christian beliefs on [ ] sidewalks outside the Fair.").

### B. *Defendants' Testimony & Factual Allegations*

#### 1. *Gary Slater.*

Gary Slater ("Slater") is the manager and CEO of the Fair. Hr'g Tr. at 37. He oversees operations at the Fairgrounds, personnel, and programming, both during the Fair and in the off-season. *Id.* Slater was not involved in the August 15–16, 2013 incidents involving Plaintiff and first became aware of Plaintiff's allegations when he was served with the present lawsuit. *Id.* at 37–38.

According to Slater, the Fairgrounds comprise 435 acres, of which about 160 acres is campgrounds. *Id.* at 50. The western edge of Fairgrounds property lies at the east curb of East 30th Street in Des Moines. *Id.* at 39. The northern edge of Fairgrounds property lies at the south curb of East University Avenue. *Id.* at 48. There is a fence enclosing the Fairgrounds property running north-south along the east side of East 30th Street north to University Avenue. *Id.* at 39. The fence continues east-west along the south side of East University Avenue, set back approximately 12–15 feet from the curb. *Id.* at 47–48. There is no public sidewalk on either the Fairgrounds side of East 30th Street or the Fairgrounds side of East University Avenue, but there is a public sidewalk on the non-Fairgrounds west side of East 30th Street and the non-Fairgrounds north side of East University Avenue. *Id.* at 39, 48.

Slater testified that Grand Avenue runs east-west from the downtown area of Des Moines straight into the Fairgrounds. *Id.* at 38. During the off-season, you can proceed down Grand Avenue through the Fairgrounds, but during the Fair, Grand Avenue is blocked just east of East 30th Street with a gate commonly referred to as Gate 11. *Id.* at 38–39. Gate 11 has the largest percentage of pedestrian traffic during the Fair, with approximately 34% (29,240) of the 86,000 people who entered the paid-admission portion of the Fair on August 15, 2013 entering through that gate. *Id.* Gate 11 sits back some distance from East 30th Street, however, once an individual takes Grand Avenue across the eastern curb of East 30th Street, they are nonetheless standing on Fairgrounds property. *Id.* at 41. In this area east of East 30th Street but before reaching Gate 11 itself, there are ticket booths, a Des

---

**4.** Plaintiff did not make any reference at hearing or in his first affidavit to any Fair Patrol officer or Trooper mentioning his "speech activity" at all on either August 15 or 16, 2013—just that on August 16, he was told that he was on Fair property and that Fair officials wanted him to leave. Because Plaintiff also does not argue this point in any of his pleadings, it appears that the reference to "speech activity" in paragraph 9 of Plaintiff's Second Affidavit is more reflective of Plaintiff's belief as to why he was asked to leave than of what the Fair Patrol and Troopers actually said to him.

Moines Police RV command center, taxi stands, vehicle pick-ups and drop-offs, DART bus drop-offs, and substantial pedestrian traffic filtering toward Gate 11 from the surrounding vicinity. *Id.* at 40–42. On a typical Fair day, there is heavy traffic along East 30th Street, and there is a history of injuries occurring in the vicinity of East 30th Street and Grand Avenue. *Id.* at 43–44. In particular, a traffic officer was critically injured at that intersection a few years ago, and a pedestrian was struck and killed at that intersection approximately 10 years ago. *Id.* at 44. Slater contends that because it is such a high-traffic area, "if there's someone that is standing there for a long period of time blocking the flow of traffic on [the sidewalk leading to Gate 11], we would certainly want to make sure that that person moved along so that traffic flow can continue and safely to everyone involved, including that person."[5] *Id.* at 44–45.

Slater testified that another significant ingress/egress point for the Fair is along East 33rd Street and University Avenue. Traffic turning into the Fairgrounds off East University Avenue enters 33rd Street through Gate 2, inside which there is room for about 5,000 vehicles to park for a fee. *Id.* at 45. Deliveries also arrive at the Fairgrounds in this location. *Id.* at 46. Set back a significant distance south from Gate 2 at the intersection of University Avenue and East 33rd Street is Gate 15, where pedestrians actually enter the paid-admission portion of the Fair.[6] Of the approximately 95,000 people who attended the Fair on August 16, 2013, about 26% (24,700) entered through Gate 15. *Id.* at 46. Slater testified that he has significant safety concerns about the entire area from the entrance to Fairgrounds property at Gate 2 all the way to Gate 15 due to "pedestrians and vehicular traffic possibly mixing together at that point or that whole area there." *Id.* at 49. Slater's concerns apply to the restroom area outside Gate 15 where Plaintiff was standing on August 16, 2013 because "25,000 people are coming and funneling right to that point, to that point and forward to [Gate 15], and so if people gather, you can make people behind them go around and as they go around if they're distracted, don't see a car or truck or something like that, that's what we're concerned about is their safety and the normal flow of traffic."[7] *Id.* Slater admitted, however, that the turn-off to the approximately 5,000 parking spaces accessible through Gate 2 is north of the restroom area where Plaintiff was standing, whereas Gate 15 is south of the area where Plaintiff was standing.[8] *Id.* at 52.

Slater contends that, as a general proposition, the Fairgrounds are entirely open to people expressing their views. *Id.* at 50. The problem with Plaintiff's conduct, however, was that on the evenings of August 15 and 16, 2013, "we [were] concerned

---

5. Slater testified that a person could stand in the grassy area between the fence running along East 30th Street and the east curb of East 30th Street (on Fairgrounds property) without significant concern because it is not a "high-traffic area." Hr'g Tr. at 45.

6. Pedestrians (but not vehicles) can enter Gate 2 without paying a fee, but must have a Fair admission ticket to proceed beyond Gate 15. Hr'g Tr. at 52.

7. Slater testified that a person could stand in the grassy area between the fence running along East University Avenue and the south curb of East University Avenue (on Fairgrounds property) without significant concern because "the traffic pattern of pedestrians is not nearly as heavy there." Hr'g Tr. at 49.

8. The clear implication is that much of the vehicular traffic in the vicinity is diverted before it reaches the area near the restrooms where *Plaintiff positioned himself on August 16, 2013.*

about certain areas and the safety of our other Fair-goers, as well as the safety of those people wanting to present [their] views. And keeping the flow of traffic in those areas uncongested." *Id.* at 51.

### 2. *Rhonda Hummel.*

Rhonda Hummel ("Hummel") testified for Defendants at the July 24, 2014 Hearing. Hummel has been a Fair Patrol officer[9] for approximately 20 years. Hr'g Tr. at 6. Hummel testified that the Fairgrounds were busy on the evening of August 15, 2013, due in part due to a Toby Keith concert and a two-for-one admission special. *Id.* at 12–13. Hummel was dispatched that evening, along with Fair Patrol officers Smith and McDonald, to Gate 11 due to "someone outside of Gate 11 that was impeding somewhat—impeding the flow of pedestrians coming inside of the Gate." *Id.* at 13–14, 21. When Hummel arrived at Gate 11, she observed Plaintiff "standing on the sidewalk in front of probably about 10, 15 feet from the ticket booth" and approximately 15–20 feet from the curb running along the Fairgrounds side of East 30th Street. *Id.* at 13–14. According to Hummel, Powell was "blocking the sidewalk causing individuals to go around him into the street." *Id.* at 15; *see also id.* at 21 ("He was blocking the sidewalk so that people had to walk around him to get to the ticket booth."). He was also holding a poster-sized sign on a pole of some kind. *Id.* at 18. The Fair Patrol Officers were concerned for the safety of anyone that might step into the street, due to the risk of getting hit by vehicles enter-

ing and exiting the area. *Id.* at 15–16. Hummel noted that a few years previously, a Des Moines police officer was critically injured at the intersection of Grand Avenue and 30th Street near Gate 11. *Id.* Smith approached Plaintiff while Hummel and McDonald stayed about six feet away from him. *Id.* at 14–15. Hummel did not hear the entire conversation between the two, but observed Plaintiff go across East 30th Street to a public sidewalk after the conversation. *Id.* at 17. She noted that there have been other, similar incidents over the years where people were asked to go across East 30th Street and off Fairgrounds due to "public safety." *Id.* at 17–18.

### 3. *Terry Orr.*

Terry Orr ("Orr") has been a Fair Patrol Officer for 16 years. Hr'g Tr. at 26. During the 2013 Fair, he was assigned to work in the vicinity of Gate 15. *Id.* at 26–27, 30. Around dusk on August 16, 2013, Orr was dispatched to the Gate 15 area on a report that "an individual up at Gate 15[ ] was impeding people from going in and standing partially in the street."[10] *Id.* at 29. When Orr arrived, he observed Plaintiff holding a sign on an aluminum pole and standing near the bathrooms "on the edge of the roadway" partially on a manhole cover. *Id.* at 29, 31–33. Orr testified that he was concerned Plaintiff would get hit by vehicles coming into the area and also because Plaintiff "was stopping people trying to keep them from going in."[11] *Id.* at 30. Orr testified that he

---

**9.** Hummel testified that Fair Patrol officers are not certified law enforcement officers, do not carry weapons, and do not have arrest powers. Hr'g Tr. at 6–7. The primary duties of Fair Patrol officers are to provide information to Fair-goers, write reports, and generally assist with the public. *Id.* at 6.

**10.** In his Affidavit, Orr testified that Plaintiff was "standing in a roadway approximately

one hundred yards south and inside of the E. University Avenue entrance to the Fair. The location where [P]laintiff was standing is approximately twenty yards north of an interior admission gate [Gate 15] to the Fair." Orr Aff. (Clerk's No. 12-3) ¶ 2.

**11.** Vehicles parking at the Fairgrounds turn into the parking area before reaching the area near the restrooms where Plaintiff was stand-

was not concerned about the metal pole attached to Plaintiff's sign.[12] *Id.* at 33. Orr approached Plaintiff and asked him to come speak with him in a "little cubby hole" near the entrance to the restrooms. *Id.* at 31; *see also id.* at 36 ("I told him to come to me because he was standing in the traffic way and I didn't want him to get hit."). Orr testified that Plaintiff came toward him and then "got right up in my face and he said don't push me." *Id.* Orr advised Plaintiff that he needed to "move on off the campgrounds because being inside the area where he was at, he was on the campgrounds. Campgrounds start at Gate 2, which I told him, and he needs to go outside Gate 2, go across the street to the convenience store over there and he could do whatever he needs to do over there." *Id.* at 31–32. Orr did not tell Plaintiff that he was impeding traffic. *Id.* at 35.

Orr testified that Plaintiff did not have an opportunity to go across the street because, at that point, Troopers arrived on the scene and told Orr that "they had it and they would take care of it from there." *Id.* at 32. He also testified that while Plaintiff would have been fine to either stand along University Avenue in the grassy area along the perimeter of the fence surrounding the Fairgrounds or go off of the Fairgrounds completely and stand on the other side of University Avenue, "[t]here was no place [Plaintiff] could go [in the vicinity of Gate 15] to get out of the way of people or vehicles at any time." *Id.* at 34.

### 4. *Tony Biancalana.*

Tony Biancalana ("Biancalana") has been employed by the Iowa State Fair Authority as Senior Director of Internal Operations since January 2007. Biancalana Aff. (Clerk's No. 12–1) ¶ 1. By Affidavit, Biancalana testified that 85,864 people attended the Fair on August 15, 2013 and 95,058 people attended the Fair on August 16, 2013. *Id.* ¶ 3. He contends the "main gate" [Gate 11] and the "north gate" [Gate 15] are very busy areas and that "[a]ny disruption of pedestrian or vehicular traffic at [these Gates] presents a significant issue." *Id.* ¶ 9.

### 5. *Doug Smith.*

Smith testified by affidavit that he has been a Fair Patrol officer since August 1999. Smith Aff. (Clerk's No. 12–2) ¶ 1. At approximately 8:00 p.m. on August 15, 2013, he responded to a dispatch report requesting that two female officers respond to Gate 11. *Id.* ¶ 2. When he arrived, Smith saw Plaintiff standing on the sidewalk outside Gate 11 holding a sign that was approximately 6′ × 3′ and attached to a metal stake or post. *Id.* ¶ 3. Smith estimates that Plaintiff was 15 feet east of the east edge of East 30th Street. *Id.*

When Smith, Hummel, and McDonald approached Plaintiff, Smith advised him that he needed to leave the Fair sidewalk. *Id.* ¶ 6. Plaintiff responded that it was a public sidewalk and he had a right to be there. *Id.* ¶ 7. Smith replied that the Fairgrounds property extends all the way to the curb on the east side of East 30th Street and that Plaintiff would need to go across the street to the west side of East 30th Street. *Id.* ¶ 8. Plaintiff complied. *Id.* ¶ 10. According to Smith, Gate 11 is extremely busy and is a dangerous location for pedestrians, motorists, and law enforcement officers alike, as evidenced by

---

ing. Hr'g Tr. at 35. According to Orr, however, "[t]here are constant cars around that [the restroom building]—all the time." *Id.*

12. Orr further testified that his actions had nothing to do with the content of Plaintiff's speech, or any words on Plaintiff's sign or t-shirt. Hr'g Tr. at 34.

the critical injury suffered by a Des Moines police officer in 2012. *Id.* ¶ 13.

## II. LEGAL STANDARD

■ The purpose of issuing a preliminary injunction in a lawsuit is to preserve the status quo and to prevent irreparable harm until the parties have a chance to conduct discovery and the court has an opportunity to hold more extensive hearings on the lawsuit's merits. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters,* 415 U.S. 423, 439, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974); *Devose v. Herrington,* 42 F.3d 470, 471 (8th Cir.1994). Federal Rule of Civil Procedure 65 authorizes the court to enter a preliminary injunction where appropriate. *See* Fed.R.Civ.P. 65(a). Rule 65(d) further requires that "[e]very order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the acts restrained or required."

■ It is well established that a party is entitled to equitable relief only if there is no adequate remedy at law. *Taylor Corp. v. Four Seasons Greetings, LLC,* 403 F.3d 958, 967 (8th Cir.2005). The burden of establishing the propriety of a preliminary injunction is on the movant. *See Baker Elec. Coop., Inc. v. Chaske,* 28 F.3d 1466, 1472 (8th Cir.1994) (citing *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.,* 871 F.2d 734, 737 (8th Cir.1989) (en banc)). A preliminary injunction is an extraordinary form of relief and must be carefully considered. *See Calvin Klein Cosmetics, Corp. v. Parfums de Coeur, Ltd.,* 824 F.2d 665, 667 (8th Cir.1987). This Court believes that the power to grant a preliminary injunction is an awesome power vested in the district court, as it expedites the trial process and forces

discovery to be completed within a limited time frame. *See* James T. Carney, *Rule 65 and Judicial Abuse of Power: A Modest Proposal for Reform,* 19 Am. J. of Trial Advocacy 87 (Summer 1995) ("The injunction is the most powerful civil remedy that the federal judiciary can employ. Its potency reflects a number of factors: immediacy of operation, comprehensiveness of relief, severity of the civil and criminal penalties for non-compliance, enforcement by the issuing tribunal, and the absence of effective judicial review. Indeed, a defendant may be punished for criminal contempt for disobedience of an order later set aside on appeal. This led Mr. Dooley to observe, 'I care not who makes the laws in a nation if I can get out an injunction.'" (quotation marks and citations omitted)).

■ In this Circuit, the four-part test enunciated in *Dataphase Systems, Inc. v. C L Systems, Inc.,* 640 F.2d 109 (8th Cir. 1981) (en banc), is applied to determine if preliminary injunctive relief is appropriate. The test set forth in *Dataphase* involves examining four factors: (1) the probability that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties and litigants; and (4) the public interest. 640 F.2d at 113. The Eighth Circuit has determined that no single factor is dispositive; all factors must be considered and balanced to determine whether to grant a preliminary injunction. *See Int'l Ass'n of Machinists & Aerospace Workers v. Schimmel,* 128 F.3d 689, 692 (8th Cir.1997). Trial courts have broad discretion in ruling on requests for preliminary injunctions and temporary restraining orders. *See Entergy Ark., Inc. v. Nebraska,* 210 F.3d 887, 898 (8th Cir.2000).

**830**

## III. ANALYSIS

In light of Defendants' response to Plaintiff's Motion for Preliminary Injunction, Plaintiff clarified at hearing that he wishes Defendants to be preliminarily enjoined in the following three ways: (1) from "treating the public property like private property so as to ban unwelcome speech, including Mr. Powell's speech"; (2) from enforcing the unwritten "prohibition against activity that could impede traffic"; and (3) from enforcing the unwritten rule banning sticks and poles. Hr'g Tr. at 76.

The Court notes at the outset that all findings of fact and conclusions of law in this Order, wherever they may appear, are preliminary, not final, and made solely for purposes of resolving the currently pending Motion for Preliminary Injunction. *See Univ. of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) ("[T]he findings of fact and conclusion of law made by a court granting a preliminary injunction are not binding at trial on the merits.").

### A. *Probability that Plaintiff Will Succeed on the Merits*

■ The first factor the Court must consider in deciding whether to issue a preliminary injunction is the likelihood that Plaintiff will succeed on the merits. In considering this factor, the Court need not decide whether Plaintiff, as the moving party, will ultimately succeed on his claims. *Am. Express Fin. Advisors, Inc. v. Yantis,* 358 F.Supp.2d 818, 826 (N.D.Iowa 2005) (citing *Glenwood Bridge, Inc. v. Minneapolis,* 940 F.2d 367, 371 (8th Cir.1991)). Rather, because Plaintiff challenges rules that were not subject to a reasoned democratic process, he must demonstrate "a 'fair chance' of success on the merits." *Planned Parenthood Minn., N.D., S.D. v. Rounds,* 530 F.3d 724, 732 (8th Cir.2008); *see also Ideal Instruments, Inc. v. Rivard Instruments, Inc.,* 479

F.Supp.2d 968, 985 (N.D.Iowa 2007) (stating that "likelihood of success on the merits requires that the movant find support for [his] position in governing law").

The First Amendment provides in pertinent part that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. Plaintiff's First Amendment right to freedom of speech is protected from infringement by state actors, such as the Defendants, by the Fourteenth Amendment. *See Lovell v. Griffin,* 303 U.S. 444, 450, 58 S.Ct. 666, 82 L.Ed. 949 (1938) ("Freedom of speech ... [is] protected by the First Amendment from infringement by Congress, [and is] among the fundamental personal rights and liberties which are protected by the Fourteenth Amendment from invasion by state action."). There is no dispute that Plaintiff's desired activity—standing on Fairgrounds property telling others of his religion through open air speech, signs, one-on-one conversations, and other expressive articles—constitutes protected speech. *See, e.g., Hill v. Colorado,* 530 U.S. 703, 716, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) ("The right to free speech ... includes the right to attempt to persuade others to change their views."); *City of Ladue v. Gilleo,* 512 U.S. 43, 48, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) ("[S]igns are a form of expression protected by the Free Speech Clause[.]"); *Meyer v. Grant,* 486 U.S. 414, 421–22, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988) (finding "direct one-on-one communication" is protected speech). Accordingly, the Court must determine the forum type of the locales where Plaintiff wishes to exercise his right to free speech, which in turn, will determine the appropriate standard applicable to a review of the disputed rules.

#### 1. *Forum type.*

■ The extent to which activity protected by the First Amendment may be

limited depends on the locale where the speech or conduct takes place. *See, e.g., Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 44–46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (noting that the "the First Amendment does not guarantee access to property simply because it is owned or controlled by the Government"; rather, "[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." (internal quotations omitted)). This requires the Court to determine the nature of the forum at issue, and then to apply an appropriate standard of scrutiny to decide whether a restriction on speech in that forum passes constitutional muster. *Id.*

Because neither party contends that the Fairgrounds are a nonpublic forum, the Court must determine whether the areas of the Fairgrounds where Plaintiff wishes to speak are traditional public fora, designated public fora, or limited public fora.

> The greatest protection is provided for traditional public fora—public areas such as streets and parks that, since "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." [*Perry,* 460 U.S. at 45, 103 S.Ct. 948 (quotations omitted)]. Content-based exclusions from such a forum must be narrowly drawn and necessary to serve a compelling state interest. Content-neutral regulations must be "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.* The same protection is provided to speakers in a "designated public forum," defined as "public property which the State has opened for use by the public as a place for expressive activity." *Id.* "The government does not create a public forum

by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius v. NAACP Legal Def. & Educ. Fund,* 473 U.S. 788, 802, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). . . .

> When public property is not by tradition or designation a public forum, the controlling public entity "may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry,* 460 U.S. at 46, 103 S.Ct. 948. The Supreme Court initially referred to this type of property as a "nonpublic forum." *See [Ark. Educ. Television Comm'n v.] Forbes,* 523 U.S. [666,] 679, 118 S.Ct. 1633 [140 L.Ed.2d 875 (1998)]; *Cornelius,* 473 U.S. at 805, 105 S.Ct. 3439. Some later cases have referred to the opening of government facilities for limited purposes as creating a "limited public forum." *See Good News Club v. Milford Cent. Sch.,* 533 U.S. 98, 106, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001). But this change in nomenclature has not changed the governing standard. A limited public forum, like a nonpublic forum, may be "limited to use by certain groups or dedicated solely to the discussion of certain subjects," and the public entity "may impose restrictions on speech that are reasonable and viewpoint-neutral." *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings College of the Law v. Martinez,* [561 U.S. 661], 130 S.Ct. 2971, 2984 n. 11, 177 L.Ed.2d 838 (2010), *quoting Pleasant Grove City v. Summum,* 555 U.S. 460, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009).

*Victory Through Jesus Sports Ministry Found. v. Lee's Summit R–7 Sch. Dist.,* 640 F.3d 329, 334–35 (8th Cir.2011).

In this case, it appears that Plaintiff wishes to return to the same locations where he attempted to exercise his free speech rights on August 15 and 16, 2013. The record firmly supports a conclusion that these locations—the sidewalk area near the ticket booth outside of Gate 11 and the sidewalk area in front of the restrooms near Gate 15—are both on Fairgrounds property. More specifically, these areas are within the mostly fenced-in perimeter of Fairgrounds property, but they are outside of the paid-admission-required portions of Fairgrounds property.

According to Defendants, the locales where Plaintiff exercised his speech in 2013 are limited public fora, regardless of the fact that they are outside the paid-admission boundary of the fair. Defs.' Br. (Clerk's No. 12–4) at 10–12 (citing *Heffron v. Int'l Society for Krishna Consciousness*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981)). Defendants point out that while there is a fence around the paid-admission boundary, there is also a fence around the entire Fairgrounds perimeter, which "is a discernable sign that the Fairgrounds are different from the surrounding area because fences are visual evidence that an area is set off from the surrounding areas." *Id.* Defendants also contend that the Fairgrounds are further differentiated from surrounding areas by the distinct lack of public sidewalks around its perimeter and by the fact that the sidewalks upon which Plaintiff stood only permit Fair—goers to enter and exit the Fair—they are not public throughfares. *Id.*

Plaintiff counters that since the referenced areas are generally available to anyone without payment of an admission fee, they should be considered traditional public fora. Pl.'s Br. (Clerk's No. 3–10) at 8–11; Pl.'s Reply Br. (Clerk's No. 15) at 2. According to Plaintiff, "the public nature of the sidewalks [where Plaintiff stood in 2013] and free access to them is sufficient for a conclusion that traditional public forum analysis should apply, and Defendants' attempts to differentiate the areas should have "no bearing on the analysis" because Plaintiff "only wants to be where access is not restricted." Pl.'s Reply at 2.

The Court preliminarily agrees with Defendants that the disputed portion of the Fairgrounds should be considered a limited public forum. In *Heffron*, the Supreme Court held that the "Minnesota State Fair is a limited public forum in that it exists to provide a means for a great number of exhibitors temporarily to present their products or views, be their commercial, religious, or political, to a large number of people in an efficient fashion." 452 U.S. at 655, 101 S.Ct. 2559. In so holding, the Court noted:

[R]espondents make a number of analogies between the fairgrounds and city streets which have "immemorially been held in trust for the use of the public and ... have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." But it is clear that there are significant differences between a street and the fairgrounds. A street is continually open, often uncongested, and constitutes not only a necessary conduit in the daily affairs of a locality's citizens, but also a place where people may enjoy the open air or the company of friends and neighbors in a relaxed environment. The Minnesota Fair, as described above, is a temporary event attracting great numbers of visitors who come to the event for a short period to see and experience the host of exhibits and attractions at the Fair. The flow of the crowd and demands of safety are more pressing in the context of the Fair. As such,

any comparisons to public streets are necessarily inexact.

*Id.* at 651, 101 S.Ct. 2559. Several other courts have similarly held that regional, county, and state fairgrounds should be considered limited public fora. *See, e.g., People for the Ethical Treatment of Animals, Inc. v. Kansas State Fair Bd.,* 891 F.Supp.2d 1212, 1225–26 (D.Kan.2012) (holding Kansas State Fair to be a limited public forum); *Marchand v. Grant County,* No. cv–07–182, 2009 WL 2998184, at *4 (E.D.Wash. Sept. 15, 2009) ("The Court finds that the county fair is a limited public forum.") (citing *Hodge v. Lynd,* 88 F.Supp.2d 1234, 1241 (D.N.M.2000)); *Angeline v. Mahoning Cnty. Agric. Soc.,* 993 F.Supp. 627, 633 (N.D.Ohio 1998); ("[T]he Canfield Fairgrounds is a 'limited public forum[.]' "); *Mood For A Day, Inc. v. Salt Lake County,* 953 F.Supp. 1252, 1261 (D.Utah 1995) (holding the 1992 Salt Lake County Fair to be a limited public forum and finding no distinction between it and the Minnesota State Fair at issue in *Heffron* ).

The Court preliminarily concludes that the Fairgrounds in their entirety are a limited public forum, at least during the eleven days per year the Fair is ongoing. The streets and sidewalks at issue are encompassed generally by the outer perimeter fence, which sets Fairgrounds property off from the surrounding areas and provides a visible indication that there is a difference between the streets and sidewalks on Fairgrounds property and those in surrounding areas. *See Warren v. Fairfax Cnty.,* 196 F.3d 186, 201 (4th Cir. 1999) ("The characterization of a place as physically a street, sidewalk, or park, without more, is not adequate to define a traditional public forum." (citing *United States v. Kokinda,* 497 U.S. 720, 727, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (plurality opinion) ("The mere physical characteristics of the property cannot dictate forum

analysis"))); *cf. United States v. Grace,* 461 U.S. 171, 177–80, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (rejecting a contention that public sidewalks adjacent to the Supreme Court building should be treated differently from other typical public sidewalks where the sidewalks were "indistinguishable from any other sidewalks in Washington, D.C." in that there was *"no separation, no fence,* and *no indication whatever* to persons stepping from the street to the curb and sidewalks that serve as the perimeter of the Court grounds that they have entered some special type of enclave." (emphasis added)). The presence of Fair personnel and law enforcement officers at the boundaries of the Fairgrounds access points also makes clear that the area is different from surrounding areas. Moreover, whether the streets and sidewalks on Fairgrounds property lie inside or outside the paid-admission boundary of the Fair, they differ significantly from the typical public streets and sidewalks that are generally considered traditional public fora. These conduits are neither continually open nor uncongested during the Fair. Motor vehicles and pedestrians cannot access these streets and sidewalks as a throughfare, i.e., they cannot use them to get from public point A to public point B. *See Kokinda,* 497 U.S. at 727, 110 S.Ct. 3115 (concluding that a United States Post Office sidewalk leading from the parking area to the front door of the post office was not a traditional public forum). Likewise, given that tens of thousands of people use these conduits each Fair day for the distinct purpose of ingress and egress to the Fair, they are both busy and subject to significant congestion. As such, these conduits are simply not representative of the types of places people can access to go about their daily affairs or for simple en-

joyment of air or company in a relaxed environment.

Despite the fact that no admission is technically required to access these outer areas of the Fairgrounds, the Court sees no basis to differentiate the portions of the Fairgrounds lying outside the paid-admission boundary, but still within the outer perimeter fence, from those areas within the paid-admission boundary.[13] During the Fair, the areas inside the paid-admission boundary "exist[ ] to provide a means for a great number of exhibitors temporarily to present their products or views, be they commercial, religious, or political, to a large number of people in an efficient fashion." *Heffron*, 452 U.S. at 655, 101 S.Ct. 2559. The areas inside the paid-admission boundary, however, could not practically or logistically serve this purpose without mechanisms and facilities to provide parking and access points allowing Fair patrons to enter and exit the paid-admission portions of the Fair in a safe, expedient, and orderly fashion. *See, e.g., Embry v. Lewis*, 215 F.3d 884, 888 (8th Cir.2000) (noting that when a school opened itself as a designated public forum for voting, the designated public forum "included the parking lot, the walkway leading to the west entrance, the hallway inside the school leading to the voting booths, and the area containing the voting booths"); *United States v. Scott*, 187 F.3d 282, 292 n. 4 (2d Cir.1999) ("Unlike a sidewalk, a parking lot is not a prototypical example of a traditional public forum." (quotation marks and citation omitted)); *Chicago Acorn v. Metro. Pier & Expo.*

*Authority*, 150 F.3d 695, 702 (7th Cir.1998) (rejecting a conclusion that sidewalks leading "only to the pier facilities" could be traditional public fora, in part, because "[t]he sidewalks are not through routes.... Rather than being part of the city's [transportation] grid, the sidewalks on the pier and the service street on its north side are internal to the pier, like the sidewalks, streets, and parking lots in Disney World or McCormick Place."). Indeed, these exterior areas are arguably at least as fundamental to fulfilling the general purpose of the Fair as the booths and vendors located inside the paid admission boundary—perhaps even more so, given that the orderly movement of the crowds is complicated significantly by the fact that pedestrian and vehicular traffic intermingle much more regularly outside the paid-admission boundary.

2. *Applicable standard of review.*

There is significant confusion in the case law regarding the proper standard of review applicable to limited public fora. For instance, the *Heffron* Court, finding the Minnesota State Fair to be a "limited public forum" applied the "intermediate scrutiny" time, place and manner analysis, i.e., it examined whether the restrictions at issue could be "justified without reference to the content of the regulated speech, ... serve a significant governmental interest, and that in doing so they leave open ample alternative channels for communication of the information." 452 U.S. at 648, 101 S.Ct. 2559 (quotation marks and citation omitted). Twenty years later, in *Good News Club v. Milford Central School*, the

---

13. Plaintiff contends that a "lack of authority" supporting Defendants' position compels a conclusion that the disputed areas should not be considered limited public fora, noting that the Supreme Court in *Heffron* actually held that the *"Minnesota State Fair* [and not any property outside it] is a limited public forum."* (Pl.'s Reply Br. at 2) (emphasis and

alterations in original). Notably, the record contains a similar "lack of authority" by Plaintiff supporting an opposite conclusion, i.e., that the parking and access areas of the Fairgrounds lying outside the paid-admission boundary should be treated differently from those areas lying within it.

Supreme Court analyzed restrictions in a limited public forum using a less exacting test, that is, whether the restriction was viewpoint neutral and "reasonable in light of the purpose served by the forum." 533 U.S. at 106–07, 121 S.Ct. 2093. Case law since *Heffron* deeming fairs to be limited public fora likewise have employed conflicting analytical standards. *Compare, e.g., Mood For A Day, Inc.*, 953 F.Supp. at 1260–61 (D.Utah) (applying intermediate scrutiny) and *Angeline*, 993 F.Supp. at 633 (same) *with People for the Ethical Treatment of Animals, Inc.*, 891 F.Supp.2d at 1226 (applying the "reasonableness" and "viewpoint neutral" standard of review) and *Marchand*, 2009 WL 2998184, at *4 (same).

The debate over the correct standard is also apparent in the present case. Plaintiff, for instance, argues that the forum analysis is "largely academic, since state officials agree the restriction is to be judged under a time, place and manner standard." Pl.'s Reply at 2. Plaintiff then employs *Heffron's* intermediate level of scrutiny, concluding that the restrictions at issue are not "narrowly tailored" to serve a significant government interest. *Id.* at 4. Contrary to Plaintiff's claim of agreement on the applicable standard, however, Defendants actually appear to proffer that the correct standard is the "reasonableness" and "viewpoint neutral" standard.[14] *See* Defs.' Br. at 12 ("The policies are

reasonable regulations in a limited public forum."), 15 ("The policies are viewpoint neutral."). In essence, then, the question is whether limited public fora should be analyzed similar to traditional and designated public fora under an intermediate level of scrutiny, as in *Heffron*, or whether they should be analyzed similar to nonpublic fora under a "reasonableness" level of scrutiny, as in *Good News Club*.

In *Victory Through Jesus*, the Eighth Circuit stated that a "limited public forum, like a nonpublic forum, may be 'limited to use by certain groups or dedicated solely to the discussion of certain subjects,' and the public entity 'may impose restrictions on speech that are reasonable and viewpoint-neutral.'" 640 F.3d at 334–35 (citing *Christian Legal Soc'y*, 130 S.Ct. at 2984 n. 11; *Pleasant Grove City*, 555 U.S. at 460, 129 S.Ct. 1125). In so holding the Court noted that "[t]hese decisions [referencing *Christian Legal Soc'y* and *Pleasant Grove City*] have cleared up circuit court confusion regarding the standard to apply to limited public fora that we discussed in *Bowman v. White*, 444 F.3d 967, 976–76 (8th Cir.2006). The standard is now clear." *Id.* at 335 n. 3. Given this explicit pronouncement, the Court concludes that the applicable standard of review for the limited public fora here at issue is the "reasonableness" and "viewpoint neutral" standard.[15] The Court further finds, however, that *Heffron's* guidance as to the

**14.** Defendants' brief is somewhat confusing as to precisely what standard they assert is appropriate. While their brief headings and some of their analysis seems to reference the "reasonableness" and "viewpoint neutral" standard, *see* Defs.' Br. at 12–15, they also make reference, in precisely the same discussion, to the need for "time, place, and manner restriction[s to] 'serve a significant governmental interest.'" *Id.* at 13.

**15.** *People for the Ethical Treatment of Animals v. Giuliani*, 105 F.Supp.2d 294, 305–11 (S.D.N.Y.2000), provides an interesting dis-

cussion of how Second Circuit case law has evolved in light of the "mixed signals emanating from the Supreme Court's notion of the limited forum," pointing out that "case law identifying the limited public forum has defined it as: (1) a term synonymous and used interchangeably with a designated public forum; (2) a distinct subcategory of the designated forum; and (3) an outgrowth of a nonpublic forum." *Id.* at 305–11 (ultimately concluding that limited public fora should be analyzed under a "reasonableness" and "viewpoint neutral" standard of review).

forum type remains applicable despite the differing standard now applicable, as clarified by *Victory Through Jesus*.

### 3. *Application of reasonableness and viewpoint neutral standard of review.*

■ Although Plaintiff contends that he was excluded from the Fairgrounds based on the content of his speech, only Plaintiff's personal opinion supports this conclusion. Indeed, Plaintiff has offered no evidence that Fair rules were applied to him and not to other persons conveying a different type of message, and Plaintiff admits that no Fair official or law enforcement officer made any comments whatsoever about his sign, t-shirt, statements, or other expressive conduct. The Fair Patrol officers who testified at hearing or by affidavit also indicated that the content of Plaintiff's expression was given no consideration in their actions. Since the rules cited by Defendants against impeding traffic and carrying poles or sticks appear to be applicable to all persons on Fairgrounds property, regardless of the content or viewpoint of any message they might seek to convey, the Court finds that the restrictions at issue are viewpoint-neutral and, accordingly, needs only analyze whether the restrictions meet the second prong of the analysis, i.e., whether they are "reasonable."

In defining what constitutes "reasonable" restrictions in the context of a limited public forum, the *Victory Through Jesus* Court stated:

Control over access to a nonpublic forum may be based on the subject matter of the speech, on the identity or status of the speaker, or on the practical need to restrict access for reasons of manageability or the lack of resources to meet total demand. *See Cornelius,* 473 U.S. at 806–09, 105 S.Ct. 3439. The restriction on access must be "reasonable in

light of the purpose which the forum at issue serves." *Perry,* 460 U.S. at 49, 103 S.Ct. 948. But a restriction "need not be the most reasonable or the only reasonable limitation." *Cornelius,* 473 U.S. at 808, 105 S.Ct. 3439. The reasonableness of a restriction on access is supported when "substantial alternative channels" remain open for the restricted communication. *Perry,* 460 U.S. at 53, 103 S.Ct. 948.

640 F.3d at 335.

### a. *Rule against "treating the public property like private property so as to ban unwelcome speech, including Mr. Powell's speech."*

Plaintiff urges the Court to enjoin Defendants from "treating the public property like private property so as to ban unwelcome speech, including Mr. Powell's speech." Hr'g Tr. at 76. Plaintiff's argument in this regard strikes the Court as more a dispute about the applicable forum type than about an actual practice or policy of Defendants—a dispute the Court has preliminarily resolved *supra.* In fact, the Court finds no evidence in the record supporting a conclusion that Defendants actually ascribed to or maintained any such policy. Accordingly, there is simply nothing for the Court to either analyze or enjoin.

Even if the Court were to hold that Defendant actually maintained a policy of "treating the public property like private property so as to ban unwelcome speech," there would simply be no way to fashion an injunction with the specificity and reasonable detail required by Rule 65(d). Rather, enjoining Defendants from such conduct would amount to the type of broad, "obey the law" injunction that is routinely found inappropriate under Rule 65(d). *See Calvin Klein Cosmetics Corp.,* 824 F.2d at 669 ("Broad language in an

injunction that essentially requires a party to obey the law in the future is not encouraged and may be struck for an order for injunctive relief, for it is basic to the intent of Rule 65(d) that those against whom an injunction is issued should receive fair and precisely drawn notice of what the injunction actually prohibits.").

b. *Rule against impeding flow of traffic.*

 The Court preliminary concludes that the restriction on activities that could impede the flow of traffic on the Fairgrounds is, itself, reasonable under the standard set forth in *Victory Through Jesus.* With somewhere in the neighborhood of up to 100,000 persons per day flowing through the disputed area during the eleven days of the Fair, Defendants have a significant and substantial interest in preventing people—even those exercising their First Amendment free speech rights—from congregating or loitering in ingress/egress areas in a way that could interfere with the orderly, safe, and efficient movement of the crowds. *See Heffron,* 452 U.S. at 649–50, 101 S.Ct. 2559 (concluding that a rule restricting certain speech activities to rented booths was justified as both a "substantial consideration" and a "valid governmental objective" in light of the asserted justification by the Minnesota State Fair of the "need to maintain the orderly movement of the crowd given the large number of exhibitors and persons attending the Fair"). Moreover, as in *Heffron,* the "State's interest in avoiding congestion and maintaining the orderly movement of fair patrons on the [F]airgrounds" remains valid even if the Court accepted that granting Plaintiff an exception to the Rule would not be likely, standing alone, to cause a significant disruption to the orderly movement of Fairgoers through the area. *See id.* at 652, 101 S.Ct. 2559. "The justification for the Rule should not be measured by the disor-der that would result from granting an exemption solely to [Plaintiff]" because "an invalid restriction on the activities of [Plaintiff] is no more valid with respect to [other individuals or entities that might wish to engage in the same conduct]." *Id.* at 652–53, 101 S.Ct. 2559. "Obviously, there would be a much larger threat to the State's interest in crowd control" if other persons engaging in speech activities like Plaintiff's came to the Fairgrounds and placed themselves on walkways providing ingress/egress to the Fair. *Id.* at 653, 101 S.Ct. 2559 ("By focusing on the incidental effect of providing an exemption from Rule 6.05 to ISKCON, the Minnesota Supreme Court did not take into account the fact that any such exemption cannot be meaningfully limited to ISKCON, and as applied to similarly situated groups would prevent the State from furthering its important concern with managing the flow of the crowd.").

Moreover, it appears that Plaintiff has "substantial alternative channels" available to communicate his message. While Plaintiff believes the sidewalks near Gates 11 and 15 are "well-suited for [his] speech" and "ideal spots for [him] to share [his] faith with others," Pl.'s Aff. ¶¶ 10–11, "[t]he First Amendment ... does not guarantee [speakers] access to every or even the best channels or locations for their expression." *Carew–Reid v. Metro Transp. Auth.,* 903 F.2d 914, 919 (2d Cir. 1990) (finding ample alternative channels for communication where musicians could reach the same or similar audiences by performing in subway mezzanines and above ground as those that could be reached by performing on subway platforms) (citing *Members of City Council of City of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 812, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)); *see also Marcavage v. City of New York,* 689 F.3d 98, 107 (2d

Cir.2012) (explaining that alternative channels need not "be perfect substitutes" nor indulge a speaker's preference for particular modes of communication); *Gresham v. Peterson*, 225 F.3d 899, 907 (7th Cir.2000) ("An adequate alternative does not have to be the speaker's first or best choice or one that provides the same audience or impact for the speech." (internal citations omitted)). Here, there is no dispute that Plaintiff could stand on public streets or sidewalks across either East 30th Street or University Avenue, and thereby convey his message to Fair-goers as they filter toward either the Gate 2 or Gate 11 entrances to the Fairgrounds. Defendants have also clearly indicated that Plaintiff remains free to "express his religious views on the Fairgrounds so long as he does not interfere with or impede the orderly flow of fair goers." Defs.' Br. at 16; Hr'g Tr. at 25 (Hummel testifying that Powell could stand in the grassy area south of Gate 11); 45–46 (Slater testifying that he would not generally have a concern if a person were to position himself "on the east side of East 30th Street in one of the grassy areas between the Fair's fence and the curb" because it is "not a high-traffic area" or "on the south side of East University in one of the grassy areas between the ... fence and the curb"); *but see id.* at 34 (Orr testifying that there would have been no place in the vicinity of Gate 15 that Plaintiff could have stood without impeding the flow of traffic, but conceding that Plaintiff could have stood between the fence and the curb on the south side of East University Avenue).

■ While the Court finds that the rule against impeding the flow of traffic is itself reasonable and viewpoint neutral, it retains significant concerns regarding how Defendants dealt with violations of the rule in 2013, and in turn, the likelihood they would respond similarly in 2014. Defen-

dants neither advised Plaintiff that he was interfering with the flow of traffic nor indicated that Plaintiff could go to another location on the Fairgrounds to continue his speech. Instead, Defendants told Plaintiff he must leave the Fairgrounds completely. Perhaps the greatest source of consternation, however, is the fact that, following the August 16, 2013 incident, Plaintiff was formally threatened with arrest if he even stepped foot on Fairgrounds property. Thus, had Plaintiff returned to the Fairgrounds on August 17, 2013 and stood in, for instance, the "grassy areas between the Fair's fence and the curb" to share his message—a spot Defendants concede would be a permissible location for Plaintiff to carry out his constitutionally protected expressive activities—he would have been subject to arrest for trespassing. On this narrow issue, i.e., Defendants' threat to arrest Plaintiff for what it concedes are constitutionally permissible activities that would not violate the rule against impeding the flow of traffic, the Court finds that Plaintiff has shown a likelihood of success on the merits that may warrant injunctive relief. *See Hodgkins v. Peterson*, 355 F.3d 1048, 1056 (7th Cir.2004) ("The Supreme Court has often noted that a realistic threat of arrest is enough to chill First Amendment rights." (citing *City of Houston, Tex. v. Hill*, 482 U.S. 451, 459 n. 7, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987); *Steffel v. Thompson*, 415 U.S. 452, 462, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974))); *Int'l Assoc. of Firefighters of St. Louis v. City of Ferguson*, 283 F.3d 969, 973 (8th Cir.2002) (concluding a plaintiff was injured by "having to give up, or hesitating to exercise, her First Amendment rights").

c. *Rule against sticks or poles.*

Defendants contend that visitors may bring a sign to the Fairgrounds, but the "sign must not be attached to any kind of pole or stick due to safety concerns with the pole or stick being used as a weapon."

Defs.' Br. at 3. Plaintiff argues that the use of a pole or stick is essential to his message, because it allows him to raise a sign conveying his chosen message above his head for long periods of time to make it more viewable by passersby. Pl.'s Second Aff. ¶ 16. Plaintiff asks the Court to enjoin Defendants from enforcing this rule against him.

In *Edwards v. City of Coeur d'Alene*, the Ninth Circuit held that a blanket prohibition on sign supports carried during parades and public assemblies on city streets failed to leave open sufficient alternative channels of communication,[16] noting that "[i]f an ordinance effectively prevents a speaker from reaching his intended audience, it fails to leave open ample alternative means of communication." 262 F.3d 856, 866 (9th Cir.2001) (citing *Heffron*, 452 U.S. at 654, 101 S.Ct. 2559). The *Edwards* court stated that "[a]s a general rule, parades and public assemblies involve large crowds and significant noise ... [meaning] it is often difficult to see more than a few feet in any direction, or to hear anyone who isn't standing nearby." *Id.* at 867. Thus, it was not clear that the plaintiff in that case could "hand out leaflets, carry signs (without supports and made of nonrigid materials), sing, shout, chant, perform dramatic presentations, solicit signatures [or] appeal to passersby" if he was deprived of the ability to hoist his protest signs up over his head. *Id.* at 866–67 ("A sign that can be hoisted high in the air projects a message above the heads of the crowd to reach spectators, passersby, and television cameras stationed a good distance away.").

In contrast to *Edwards*, there is no indication in this case that Plaintiff requires a sign "attached to supports such as poles or sticks" to "overcome the communication problems endemic to [situations such as parades and public assemblies]." *Id.* at 867. Accordingly, it appears there are "substantial alternative" methods of communication available to Plaintiff to convey and communicate his message to Fair-goers. He remains free to carry signs without sticks or poles, wear clothing with words conveying his message, hand out leaflets, engage in open air speech, converse one-on-one with passersby, sing, chant, perform dramatic presentations, or engage in any number of communicative or expressive activities. *See Victory Through Jesus*, 640 F.3d at 335 ("The reasonableness of a restriction on access is supported when 'substantial alternative channels' remain open for the restricted communication." (citation omitted)). Moreover, the Court sees nothing inherently unreasonable in Defendants desire to preclude from Fairgrounds property poles and sticks that could potentially be used as weapons, particularly given the purpose of the Fair, and the need to protect the safety and security of the large crowds in attendance each day. Accordingly, the Court concludes that the restriction likely survives the reasonableness standard of *Victory Through Jesus*.

## B. *Threat of Irreparable Harm to Plaintiff*

"[I]n any case, 'the threshold inquiry is whether the movant has shown the

---

16. The *Edwards* court also held that the blanket prohibition burdened substantially more speech than was necessary and thus, was not "narrowly tailored to further the City's interest in public safety." 262 F.3d at 866. In contrast to the present case, which applies a reasonableness and viewpoint-neutral standard to limited public fora, *Edwards* employed the intermediate scrutiny time, place, and manner approach applicable to traditional public fora restrictions. *See id.* at 862 (evaluating whether the ordinance was content neutral, "narrowly tailored to serve a significant government interest," and leaves open ample alternative means of communication).

threat of irreparable injury.'" *Glenwood Bridge*, 940 F.2d at 371 (quoting *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir.1987)). Thus, "the movant's failure to sustain its burden of proving irreparable harm ends the inquiry 'and the denial of the injunctive request is warranted.'" *Id.* (quoting *Gelco*, 811 F.2d at 420); *see also Blue Moon Entm't, L.L.C. v. Bates °City*, 441 F.3d 561, 564 (8th Cir. 2006) (stating that failure to show irreparable harm is an "independently sufficient basis upon which to deny a preliminary injunction").

■ Here, Plaintiff asserts that he has a legitimate fear of arrest should he again attempt to exercise his First Amendment rights, in the fashion he did on August 15 and 16, 2013, on the Fairgrounds. "It is well-settled law that a 'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Phelps–Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir.2008) (overruled on other grounds) (quoting *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality)).

## 1. *Rule against impeding flow of traffic.*
### a. *The rule against impeding the flow of traffic generally.*

■ Because the Court has found that the rule against impeding the flow of traffic on the Fairgrounds is, itself, likely reasonable, it further concludes that it is unlikely that Plaintiff can show irreparable harm by the denial of his request for a preliminary injunction. When a plaintiff "can establish a sufficient likelihood of success on the merits of h[is] First Amendment claim, [ ]he will also have established irreparable harm as the result of the deprivation." *Id.* (citing *Marcus v. Iowa Pub. Tele.*, 97 F.3d 1137, 1140–41 (8th Cir. 1996)). The converse proposition also appears true in First Amendment cases,

however, i.e., a failure to prove a likelihood of success on the merits will generally imply a lack of irreparable harm factor as well. *See, e.g., McNeilly v. Land*, 684 F.3d 611, 620–21 (6th Cir.2012) ("Once a probability of success on the merits was shown, irreparable harm followed.... Because [the plaintiff] does not have a likelihood of success on the merits, ... his argument that he is irreparably harmed by the deprivation of his First Amendment rights also fails."); *Phelps–Roper*, 545 F.3d at 690 (stating that the "success on the merits" factor of *Dataphase* will generally determine the irreparable harm and public interest factors as well: "In a First Amendment Case ... the likelihood of success on the merits is often the determining factor whether a preliminary injunction should issue."); *Shaw v. Gibson*, No. 5:14–cv–00139, 2014 WL 3057407, at *3 (E.D.Ark. June 17, 2014) ("*Phelps–Roper* also stated that to establish irreparable harm on the basis of a loss of First Amendment freedoms, the movant would need to establish a 'sufficient likelihood of success on the merits' of those claims." (citing 545 F.3d at 690)).

### b. *Defendants' threat to arrest Plaintiff for constitutionally permissible activities.*

Having found that Plaintiff has shown a sufficient likelihood of success on the merits of his claim that Defendants improperly threatened him with arrest, the Court now concludes that Plaintiff has also adequately shown a threat of irreparable injury to his First Amendment right to free speech. *See Phelps–Roper*, 545 F.3d at 690 ("A 'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" (citations omitted)).

## 2. *Rule against sticks or poles.*

■ As with the rule against impeding traffic, the failure to demonstrate a likeli-

hood of success on the merits also minimizes the threat of irreparable injury to Plaintiff based on the rule against sticks or poles. This alone would suffice to conclude that the irreparable injury factor weighs against injunctive relief. The analysis of the poles and sticks rule suffers from an additional defect, however. That is, while Defendants contend generally that this rule exists, neither they nor Plaintiff have proffered any actual evidence tending to support a conclusion that the rule played any role whatsoever in Plaintiff being asked to leave the Fairgrounds on either August 15 or 16, 2013, or that it would likely cause an infringement of Plaintiff's First Amendment rights in 2014 or at any other time. *See generally* Defs.' Br. at 3–4.

Regarding the August 15, 2013 incident, Defendants state simply that Plaintiff was, in addition to impeding the flow of traffic, "holding a sign on a metal pole or stick" and that Smith, the officer who spoke to Plaintiff on this occasion, "understands that people exercising their free speech rights must not . . . use signs on sticks or poles due to safety concerns." Defs.' Br. at 4. Smith says nothing more than this in his affidavit. *See* Smith Aff. ¶ 3 (stating that Plaintiff was "holding a sign . . . attached to a metal stake or post"); *id.* ¶ 16 (stating that he often organizes protests and instructs protestors to "ensur[e] that any signs they carry are not attached to stakes or poles which might be used as weapons." Likewise, Hummel testified merely that Plaintiff's sign was "on a pole of some kind," but she made no further reference to the pole as being a basis for asking Defendant to leave the Fairgrounds. Hr'g Tr. at 15–18.

As to the August 16, 2013 incident, Defendants contend merely that "the officer saw Powell was holding a sign on a metal pole." *Id.* at 5. However, while Orr stated in his affidavit that Plaintiff was holding a sign "attached to a metal stake or post," Orr Aff. ¶ 3, he testified at hearing that he had no concern about the metal pole at the time of his interaction with Plaintiff. Hr'g Tr. at 33 (Q. "Any concern about the metal pole that was attached to the sign?" A. "Not at the time, no.").

■ Based on this record, the Court simply cannot discern what, if any, action Defendants might take were Plaintiff to stand on the Fairgrounds, while not impeding the flow of traffic, but while holding a sign on a stick or pole. The lack of evidence regarding Plaintiff's use of a sign on a pole or stick in 2013 as a basis for his removal from the Fairgrounds lends support to a conclusion that Defendants might take no action at all. Certainly it is also possible that Defendants would eject Plaintiff from the Fairgrounds, or perhaps simply ask him to remove his sign from the offensive pole or stick. The mere *possibility* of harm, however, is insufficient to satisfy Plaintiff's burden to show an entitlement to injunctive relief; rather, Plaintiff must demonstrate that "the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Roudachevski v. All–Am. Care Ctrs., Inc.,* 648 F.3d 701, 706 (8th Cir.2011) (quoting *Iowa Util. Bd. v. F.C.C.,* 109 F.3d 418, 425 (8th Cir.1996)). Plaintiff has not made such a showing and, thus, has not adequately shown a threat of irreparable harm in relation to the poles and sticks rule.

### C. *Balance of the Harms*

#### 1. *The rule against impeding the flow of traffic generally.*

■ The final two *Dataphase* factors require the Court to examine the balance of the harms. Specifically, the Court must evaluate the potential harm in granting or denying the injunction upon both of

the parties to the dispute and upon other interested parties, including the public. *Dataphase*, 640 F.2d at 114. Defendants contend that given the sheer number of patrons accessing the Fair in such a short period of time, they will be damaged if the Court prohibits them from "enforcing the restrictions on activities that interfere with or impede the orderly flow of fair patrons." Defs.' Br. at 17. Likewise, Defendants contend that Fair-goers may be harmed if Defendants are enjoined from enforcing the rule against impeding the flow of traffic. *Id.* Plaintiff counters that the public's interest is served best by ensuring free expression of ideas, and that Defendants would not be harmed because "Powell's request for an injunction would do nothing more than require compliance with the U.S. Constitution." Pl.'s Br. at 14–15.

As in *Heffron*, "[b]ecause the Fair attracts large crowds, it is apparent that the State's interest in the orderly movement and control of such an assembly of persons is a substantial consideration." 452 U.S. at 650, 101 S.Ct. 2559. The Court, thus, agrees with Defendants that an injunction prohibiting them from enforcing the rule against impeding the flow of traffic on the Fairgrounds would severely damage their interest in ensuring safe ingress and egress to Fair-goers. As well, the Court agrees that enjoining enforcement of the rule may pose a substantial risk of danger to the public. Accordingly, the Court finds that the balance of the harms weighs against granting preliminary injunctive relief as to the enforcement of the rule against impeding the flow of traffic.[17]

**2.** *Defendants' threat to arrest Plaintiff for constitutionally permissible activities.*

The Court can discern no particular harm that would befall either Defendants or the public were the Court to enjoin Defendants from arresting or threatening to arrest Plaintiff solely for engaging in protected speech on the Fairgrounds in locations where Defendants have already conceded that he is not impeding or would not be likely to impede the flow of traffic.

**D.** *Additional Considerations*

Even were the Court to find that the *Dataphase* factors weigh in favor of granting Plaintiff's request for a preliminary injunction as to the rule against impeding the flow of traffic generally, the Court would still decline to grant Plaintiff's request for injunctive relief on this basis because, as Plaintiff himself states, his "request for an injunction would do nothing more than require compliance with the U.S. Constitution." Pl.'s Br. at 15. As noted previously, this would amount to the type of "obey the law" injunction that is strongly disfavored. *See Calvin Klein Cosmetics Corp.*, 824 F.2d at 669 ("Broad language in an injunction that essentially requires a party to obey the law in the future is not encouraged and may be struck for an order for injunctive relief, for it is basic to the intent of Rule 65(d) that those against whom an injunction is issued should receive fair and precisely drawn notice of what the injunction actually prohibits."). Indeed, it is difficult to imagine

17. The Court sees no need to evaluate the balance of the harms factor regarding the poles and sticks rule because it has already concluded that Plaintiff has failed to show a threat of irreparable injury in *supra* § III.B.2. *See Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir.2003) ("Failure to show irreparable harm is an independently sufficient ground

upon which to deny a preliminary injunction."); *Baker Elec. Co-op.*, 28 F.3d at 1472 ("No single factor in itself is dispositive.... However, a party moving for a preliminary injunction is *required* to show the threat of irreparable harm." (emphasis added, quotation marks and citations omitted)).

how the Court could reasonably comply with the specificity requirements of Rule 65(d) by simply telling Defendants they cannot enforce rules against impeding the orderly flow of Fair-goers or bringing sticks or poles onto the Fairgrounds that could be used as weapons.

## IV. CONCLUSION

For the reasons stated herein, the Court finds that Plaintiff has failed to carry his burden to demonstrate an entitlement to preliminary injunctive relief, except for on the narrow issue of Defendants' threat to arrest Plaintiff for constitutionally permissible activities. Accordingly, Plaintiff's Motion is GRANTED IN PART and DENIED IN PART. Specifically, Defendants are hereby enjoined from arresting or threatening to arrest Plaintiff solely for engaging in protected speech on the Fairgrounds in locations where Defendants have already conceded that he is not impeding or would not be likely to impede the flow of traffic.[18] Plaintiff's request for injunctive relief is denied in all other respects.

IT IS SO ORDERED.

[18]. Specifically, Defendants offered testimony that Plaintiff could stand in the grassy area south of Gate 11, "on the east side of East 30th Street in one of the grassy areas between the Fair's fence and the curb," or "on the south side of East University in one of the grassy areas between the ... fence and the curb." *See* Hr'g Tr. at 25 (Hummel testifying that Powell could stand in the grassy area south of Gate 11); 34 (Orr testifying that Plaintiff could stand between the fence and curb on the south side of East University), 45–46 (Slater testifying that Plaintiff could reasonably stand between the Fairground fence and curbs along East University or East 30th Street).

The Court encourages Defendants to provide Plaintiff's counsel with a list of areas on the Fairgrounds, in addition to those already discussed in this Order, where Plaintiff could exercise his free speech activities without impeding traffic or posing a significant risk of impeding traffic. The Court further encourages Defendants to undertake additional training for its Fair Patrol officers to ensure that free speech is permitted to the maximum extent possible in all areas of the Fairgrounds, whether inside or outside the paid-admission boundary, and consistent with Fair's obligation to ensure the safety and security of all of its patrons.